UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| ALLISON KEEGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Case No. |
| v. | ) | 12-cv-264-JMH |
| | ) | |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*\*\*

Plaintiff Allison Keegan (Keegan) seeks review of the denial of benefits under a long-term disability (LTD) benefits plan (Plan) by Defendant Metropolitan Life Insurance Company (MetLife) pursuant to 29 U.S.C. § 1132(a)(1)(B). Keegan and MetLife have filed motions for judgment[1] [DE 22, 32] and this matter has been fully briefed by the parties [DE 33, 35]. The Court being sufficiently advised, this matter is now ripe for review.

Keegan's medical records demonstrate that he had several health issues initially contributing to his disability under the plan. The initial period of disability was caused by his cancer

_____

[1] A "Motion for Judgment" is the proper procedural method for relief in an appeal of the denial of benefits under ERISA. *See Wilkins v. Metro. Life Ins. Co.*, 150 F.3d 609, 619 (6th Cir. 1998).

diagnosis and subsequent treatment, during which it was not possible for Keegan to continue to work at his position as a senior engineer. Evidence in the record established that Keegan suffered from new cognitive deficiencies resulting from his chemotherapy treatment. After the remission of his cancer, Keegan's psychiatric and cognitive symptoms remained, causing the continuation of his disability status. His treating physicians generally agreed that his psychiatric symptoms, such as anxiety, stress, and depression may have been exacerbating his cognitive symptoms. But the consensus among his treating physicians was that Keegan's cognitive impairments were caused by the effects of his cancer treatment.

Plaintiff first argues that MetLife's decision to deny his claim was arbitrary and capricious because there was no evidence showing that his condition had improved since the date he was deemed disabled under the terms of the plan. Additionally, he argues that new evidence of his medical condition, received after the determination and not reviewed by MetLife, may be considered by this Court based on MetLife's due process error. MetLife defends its determination by relying on the lack of recent objective testing and current complaints in Keegan's record regarding his cognitive deficiencies. MetLife points out that Keegan could have submitted current cognitive testing

during the appeal of the discontinuation of his benefits, but did not. Finally, both parties argue that they are entitled to a recover amounts owed due to miscalculations of payments made to Keegan during the time period in which he received benefits under the Plan.

MetLife's reasoning for the discontinuation of LTD benefits was not based on a rational basis. Evidence in the record does not support the conclusion that Keegan's cognitive impairments had improved to the point that he was no longer disabled. Accordingly, for the following reasons, Keegan's motion for judgment will be granted, and MetLife's motion for judgment will be denied, although MetLife is entitled to recover the amount of alleged overpayments from the LTD benefits owed to Keegan.

## I. Factual Background

Keegan worked as a senior engineer for Samsung in Austin, Texas, managing, installing, and maintaining high-end computer systems. [DE 14, ML 1375]. This was a demanding position that, essentially, required Keegan to be "on call 24 hours/day," and sometimes required that he sleep at the office, if necessary, while working on a project. [DE 14, ML 144]. At the time of his disability, Keegan's base salary was approximately $96,000, and his bonuses exceeded $10,000. [DE 14, ML 1203; DE 22-2].

In February 2009, he was diagnosed with Stage IV mantle cell lymphoma and underwent chemotherapy treatment at The University of Texas MD Anderson Cancer Center with Dr. Jorge Romaguera, an oncologist, in Houston, Texas. [DE 14, ML 1342; DE 14, ML 1285]. Keegan was treated with eight cycles of high-dose chemotherapy between February and August 2009. [DE 14, ML 346]. Some of the treatment protocols used were experimental. [DE 14, ML 1238; DE 14 ML 16—18]. Keegan tolerated the treatment well at the time, but still suffered from weakness, fatigue, nausea, fevers, infections, bone pain, and other side effects. [DE 14, ML 1238; DE 14 ML 16—18].

In addition to the more common physical repercussions from chemotherapy, Keegan's treatment had other effects on him. He moved to Houston during his treatment, meaning that his was removed from his wife and teenage daughter. [DE 14, ML 239]. Sometime after his diagnosis, he and his wife separated. He reported feelings of stress and anxiety during this time period, as well as depression. [DE 14, ML 239]. Before his cancer diagnosis, Keegan had been diagnosed and intermittently treated for bipolar disorder, depression, and anxiety, but these conditions had not previously interfered with his work. [DE 14, ML 260]. These conditions were exacerbated during his chemotherapy treatment and after. He reported to at least one

of his treating physicians that he was frustrated and that his "current inability to work [was] 'beginning to gnaw' at him." [DE 14, ML 239].

Additionally, Keegan started noticing changes in his cognition during the second and third cycle of chemotherapy, which "worsened as treatment progressed." [DE 14, ML 239]. His cognitive changes did not resolve after his chemotherapy treatments ended, as evidenced by subsequent objective testing and his own subjective observations. [DE 14, ML 239].

Keegan received the maximum amount of short-term disability (STD) benefits. [DE 14, ML 1375]. Once the term for STD benefits expired, Keegan's claim was transitioned to one for LTD benefits. [DE 14, ML 1205—07]. MetLife initially approved LTD benefits, but later found that Keegan had improved to the point that he was no longer disabled under the terms of the plan. [DE 14, ML 1205—07; DE 14, ML 896-99].

After Keegan's chemotherapy treatment concluded, he moved back to Austin, Texas, where he was followed for relapse by Dr. Michael Kasper of Texas Oncology. [DE 14, ML 754—55]. During an office visit with Dr. Kasper on February 4, 2010, Keegan complained of problems with his memory and anxiety. [DE 14, ML 745—46]. Dr. Kasper recommended an evaluation by a neurologist for memory loss. [DE 14, ML 746].

On February 22, 2010, Keegan saw a primary care physician, Dr. Wendy Merola, for depression. [DE 14, ML 802]. She noted that he was anxious, depressed, and tense. She recommended exercise and that he connect with his friends and family. [DE 14, ML 803].

The next day, February 23, 2010, Keegan saw Dr. Arthur Forman for a neuro-oncology consultation on the basis of a referral from Dr. Romaguera. [DE 14, ML 352]. Specifically, Dr. Forman was to address the "cognition problem and neuropathy." [DE 14, ML 354]. His notes indicate that "there are possibilities of the white matter dysfunction disorder secondary to neuro-toxic agent and it can contribute to his new cognition problem." [DE 14, ML 354]. Dr. Forman and his associates spent more than three hours examining and counseling Keegan about his cognitive problem, neuropathy, and treatment options. [DE 14, ML 354]. Dr. Forman indicated that the complex mix of medication prescribed to Keegan was playing a role in his neurological condition. [DE 14, ML 369]. Dr. Forman strongly suggested simplification of his medical program and suggested certain medicines that should be reduced or eliminated. [DE 14, ML 354]. An MRI taken in March 2010 was unremarkable. [DE 14, ML 1092].

Later, on March 26, 2010, Mariana Witgert, Ph.D., performed a neuropsychological evaluation of Keegan related to his complaints of memory loss. [DE 14, ML 239]. Dr. Witgert's testing, which took approximately nine (9) hours, revealed that Keegan was impaired in aspects of memory, executive functioning, and motor skills. [DE 14, ML 240—41]. During a memory performance test using a word list, Keegan showed "reduced learning efficacy and impaired retention, with no benefit from retrieval cues" and his visual learning was also impaired. [DE 14, ML 241]. "[W]eaknesses were observed for aspects of executive functioning, including reduced processing speed, difficulty with divided attention, and low average range verbal reasoning." [DE 14, ML 241]. Additionally, Keegan's upper extremity grip strength and motor dexterity in his right hand were impaired. [DE 14, ML 241]. While Keegan's intelligence prior to cancer treatment was estimated to be "high average," Dr. Witgert's testing demonstrated that he had average intelligence following cancer treatment. [DE 14, ML 240]. Overall, his memory performance was "characterized by reduced learning efficiency and impaired retention, with no benefit from retrieval cues. Similarly, learning and recall for visual information was impaired." [DE 14, ML 241]. His free recall after a delay was approximately 60%, which is in the low average

range.  [DE 14, ML 240].  He was weak in "aspects of executive functioning, including reduced processing speed [and] difficulty with divided attention . . . ." *Id.*  Dr. Witgert concluded that:

> observed impairments in memory and executive functioning likely reflect the untoward impact of his cancer and cancer treatment. Depression and anxiety are likely to exacerbate underlying cognitive weaknesses. Given the nature and severity of his current cognitive impairments, it appears unlikely that he would be able to resume competitive employment at this time.

[DE 14, ML 241].  At the time Dr. Witgert found Keegan to be unable to work due to his cognitive impairments, Keegan was "independent in performing basic activities of self-care," managed his own medication, assisted with household tasks, and was driving independently.  [DE 14, ML 239].

Feeling that the Lexapro prescribed by his physician eight weeks earlier was making him more anxious, Keegan visited Dr. Denae Rickenbacker in September 2010 for a second opinion.  [DE 14, ML 1021].  Dr. Rickenbacker administered a Folstein Mini-Mental Status Exam, a 30 question test designed specifically to assess cognitive impairment.  [DE 14, ML 1022].  He scored a perfect 30 out of 30, although he did have some difficulty with calculation.  [DE 14, ML 1017—18].  Dr. Rickenbacker later estimated Plaintiff at a 65 on the Global Assessment of Functioning test ("GAF").  [DE 14, ML 1017—18].

In February 2011, Keegan saw Dr. Romaguera for restaging follow up and evaluation for mantle cell lymphoma. [DE 14, ML 308]. There was no evidence of recurrent cancer. [DE 14, ML 308]. Metlife points out that the notes from that visit indicate that "he is able to perform his daily activities without any difficulty." [DE 14, ML 308].

In late March 2011, Dr. Rickenbacker noted "intact" memory and concentration on Keegan's chart. [DE 14, ML 943]. In April 2011, Keegan told Dr. Rickenbacker that his mood and anxiety were well-controlled. [DE 14, ML 941]. Dr. Rickenbacker indicated that Keegan's psychiatric symptoms were in remission. [DE 14, ML 942].

During an interview with one of MetLife's in-house psychiatric consultants on June 20, 2011, Keegan reported that he had cognitive issues since his cancer treatment. The consultants' notes of the conversation read as follows:

> If I don't write something down, it does not get done. I worked at a high level IT program and I cannot do that any more. I can't work at the same level as when I left Samsung. I can call boats and do things for my friends at the ski dock. . ." He also reports that he has tingling and numbness in his hands and feet and has not improved. In his job as Sr. Engineer he worked with software and hard ware (sic). He developed computer systems, designed hardware, hardware systems. He currently works part time helping a friend at a boat shop approximately 20 hours/month. In describing this job at the boat shop he reports, "The owner is a friend from 20 years ago. I check chemicals, make calls, run errands, pick up parts or deliver, pick up

> a new boat at the factory, so I do a little driving, some simple computer work but not extensive. Whatever they need. I identify something that needs to be done and go do. Sort of like at Samsung but at a lower level. . ."

[DE 14, ML 141—42]. Importantly, Keegan reported that "his depression has improved but he doesn't see much difference in his cognitive skills." [DE 14, ML 143]. The interviewer observed that Keegan had difficulty with dates and that his speech was "halting." [DE 14, ML 144—45]. Nonetheless, the notes indicated that "memory issues and cognitive issues are not currently document[ed] in the medical [records]" and there was "no current information to support a Cognitive DO, NOS." [DE 14, ML 157].

In a letter dated July 13, 2011, MetLife informed Keegan that his claim was denied, effective June 3, 2011, because he no longer met the plan's definition of disability. [DE 14, ML 896—99]. In denying benefits, MetLife relied on Dr. Rickenbaker's treatment notes indicating that Keegan's psychiatric symptoms were in remission. While the letter acknowledged the significant cognitive impairments identified through neuropsychological testing, MetLife states "the most recent information previously referenced and received from Dr. Rickenbacker, current treating psychiatrist, does not indicate significant cognitive impairment and instead reports remission

of psychiatric symptoms." [DE 14, ML 897]. MetLife also referenced Keegan's own reports of continued memory issues and halting speech during an interview on June 20, 2011. [DE 14, ML 898]. However, "memory issues and cognitive issues were not currently documented in the medical. . . . There is no current information to support a Cognitive [sic] diagnosis." [DE 14, ML 898]. In summary, MetLife concluded that the "medical on file currently lacks objective findings whether by diagnostic testing or by physician assessment finding that indicate you have either physical or cognitive dysfunction . . .". [DE 14, ML 898].

Keegan appealed his determination. During the appeal MetLife hired two outside consultants to review the records, but at no point did MetLife ask for Keegan to undergo a physical exam. MetLife hired Keven Murphy, Ph.D, a licensed psychologist with a specialty in neuropsychology and John Ellerton, M.D., F.A.C.P., Diplomate, Subspecialty Board of Oncology, to review the file and issue reports.

Dr. Murphy called many of Mr. Keegan's treatment providers in an attempt to learn more about his condition, including Dr. Witgert. [DE 14, ML 224]. However, Dr. Witgert informed him that the release form allowing her to share Mr. Keegan's medical information with MetLife had expired, and she would need a current release before she could talk to Dr. Murphy. [DE 14, ML

224]. There is no indication in Dr. Murphy's report that any additional efforts were made to speak with Dr. Witgert. Considering his review of the record and his conversations with Keegan's treating physicians or their office personnel, Dr. Murphy concluded that Keegan's cognitive problems must have resolved. [DE 14, ML 229—30]. Dr. Ellerton concluded that Keegan's cancer was in remission and that he was not disabled as a result of any physical symptoms.

Based on these reports, MetLife denied Keegan's appeal by letter dated March 28, 2012. [DE 14, ML 211—15]. Despite Dr. Witgert's report and the lack of any evidence of improvement in his cognitive impairments, the denial stated that "[t]here was a question of some difficulty with his cognitive functioning," but "the [consultant] noted there was nothing in the record that would suggest the Mr. Keegan had any specific difficulty" with cognitive functioning. [DE 14, ML 213].

Dr. Witgert conducted another round of cognitive assessment with Keegan one week after the date of MetLife's denial of his appeal, on April 4, 2012. [DE 22-2]. Keegan asserts that Dr. Witgert concluded that Keegan was still disabled as a result of his cognitive impairments at that time.

## II.    Standard of review

Generally, a denial of benefits challenged under 29 U.S.C. § 1132 (a)(1)(B) is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties and the Court agree that MetLife's Plan grants the administrator discretionary authority to determine eligibility for benefits or construe terms of the plan and, thus, this Court will review MetLife's determination under the arbitrary and capricious standard of review. *See Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 456 (6th Cir. 2003) (citations omitted). Under this standard of review, the administrator's decision will be upheld if the decision is "rational in light of the plan's provisions." *Id.* at 457 (citations omitted).

## III. Analysis

## A. MetLife's determination was arbitrary and capricious.

The initial denial letter sent to Keegan stated that:

[T]he most recent information previously referenced and received from Dr. Rickenbaker, current treating psychiatrist, does not indicate significant cognitive impairment and instead reports remission of psychiatric symptoms. . . . In an interview . . . you reported memory issues and speech was halting during the interview . . . . However, memory issues and cognitive issues were not currently documented in the

13

> medical. We attempted to clarify information with Dr. Rickenbaker by phone and fax [ ] but have received no response. There is no current information to support a Cognitive [sic] diagnosis. The frequency and type of treatment do not appear to be consistent with a severe and debilitating major psychiatric disorder . . . .

[DE 14, ML 897–98]. Keegan does not dispute that his psychiatric symptoms improved to the point that he stopped seeing Dr. Rickenbacker, his psychiatrist, in April 2011, but maintains that his cognitive deficiencies were separate and had not improved at the time of MetLife's discontinuation of benefits. This Court agrees.

The ultimate question is whether "a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not 'disabled' within the plan's terms." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006). Evidence suggesting that Keegan's psychiatric symptoms had resolved does not necessarily reveal an improvement in cognitive symptoms and certainly does not mean that his cognitive deficiencies improved to the point that Keegan was no longer disabled under the terms of the Plan. MetLife's conclusion that the resolution of Keegan's psychiatric symptoms translated to resolution of his cognitive abilities is not reasonable given the evidence in the record.

There is evidence that Keegan's psychiatric symptoms resolved. However, the only opinion in the record as to *cause* was that his cognitive deficiencies were caused by his cancer treatment. There is no indication that his cognitive symptoms had resolved to the point that he was capable of earning more than 80% of his predisability earnings.[2] His psychiatric issues may have exacerbated his cognitive symptoms, but they were not the cause of his cognitive impairments. The record demonstrates that MetLife's consultants confused improvement of Keegan's psychiatric symptoms with resolution of his cognitive deficiencies. This confusion resulted in conclusions unsupported by the record before this Court. Without evidence

---

[2] The LTD Plan states:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
> You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
> You are unable to earn:
> during the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and
> after such period, more than 80% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account your training, education and experience.

[DE 14, ML 1401].

that Keegan's cognitive deficiencies had improved, the only evidence in the record of cognitive impairments was a finding by Dr. Witgert that Keegan was disabled due to his cognitive symptoms.

MetLife's consultant who reviewed Keegan's records concluded that Keegan "is able to [perform activities of daily living] without assistance and was able to get self [sic] to [doctor's appointment], as he is noted to show up alone, therefore cognitive issues have resolved also." [DE 14, ML 150]. However, there is no indication in the record that Keegan's cognitive impairments ever impacted his ability to perform activities of daily living or transport himself to his appointments. In fact, during the time he was considered disabled by MetLife and at the time Dr. Witgert concluded that Keegan was unable to return to work, he was capable of independent daily living and driving. Thus, there seems to be no correlation between his ability to live independently and perform daily tasks and the severity of his cognitive symptoms.

In addition to misconstruing improvement of psychiatric issues with cognitive improvement, MetLife's decision that Keegan was no longer disabled was not based on substantial evidence. Although the arbitrary and capricious standard of review may be deferential, this "review is not no review and

16

deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted) (internal quotation marks omitted).

Cancellation of benefits in the absence of evidence showing that the claimant's condition had improved and without an explanation for the apparent discrepancy from earlier assessments is arbitrary and capricious. *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009); *see also McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 704 (6th Cir. 2012) ("The plan administrator must have some reason for the change."). "[I]t is reasonable to require a plan administrator who determines that a participant meets the definition of 'disabled,' then reverses course and declares that same participant 'not disabled' to have a *reason* for the change; to do otherwise would be the very definition of arbitrary and capricious.'" *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (emphasis in original). A decision is not supported by substantial evidence if there is no evidence that the claimant's condition improved and improvement is the only basis offered for the plan administrator's change in determination.

In this case, Dr. Witgert stated that Keegan was unable to work given the severity of his cognitive impairments. That was

the only opinion regarding Keegan's cognitive ability to return to work by a treating physician. MetLife argues that there is no evidence that Keegan still suffered from the same cognitive deficiencies at the time. However, Keegan reported during his interview that he was still having problems with his memory and the interviewer also observed symptoms that would be consistent with continued cognitive impairment. Moreover, there is objective testing and an opinion by Dr. Witgert that Keegan was unable to work due to his cognitive deficiencies. It is undisputed that none of Keegan's treating physicians opined, at any time, that his cognitive symptoms had resolved. No cognitive testing demonstrated any improvement in any of the areas of cognitive impairments identified in Dr. Witgert's extensive testing.

While some of the notations contained in treating physicians' files indicate that Keegan did not report memory or cognitive difficulties during those office visits, these are physicians who were treating Keegan for issues other than his cognitive deficiencies. Metlife argues that the absence of cognitive symptoms in the treating notes submitted by Keegan's oncologist and psychiatrist as evidence of improvement, but Keegan was not visiting these physicians for treatment of his cognitive issues. The absence of the notation of cognitive

symptoms by these specialists is not necessarily indicative of the degree of Keegan's improvement in this area.

MetLife relies on Keegan's perfect score on the Folstein Mini-Mental Status Exam administered by Dr. Rickbacker, which MetLife asserts was designed to assess cognitive impairment as evidence that Keegan's cognitive impairment improved. However, there is no indication that this test necessarily represented an improvement over his earlier testing in the same areas of cognition.

That there is some evidence to support MetLife's determination that Keegan is not disabled is of no import. This Court's review is more extensive. This standard of review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172. "Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence—no matter how obscure or untrustworthy—to support a denial of a claim for ERISA benefits." *Id.* (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774—75 (7th Cir. 2003)).

Considering the quantity and quality of the medical evidence and opinions on the issues, MetLife's decision was not

supported by substantial evidence, as there is no evidence that the claimant's condition improved and improvement was the only reason offered for the change in the disability determination.

Additionally, in this case, MetLife's failure to conduct a physical exam, where it had reserved the right to do so, is further evidence of an arbitrary and capricious decision. *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("[T]he failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). Rather than conduct a physical exam, MetLife relied on the absence of current complaints of cognitive deficiencies demonstrated in a record review to deny his benefits. However, Keegan reported that his cognitive difficulties continued during his interview with MetLife. In his interview with an in-house psychiatric consultant shortly before his benefits were denied, Keegan reported that "depression has improved but he doesn't see much difference in his cognitive skills." [DE 14, ML 143]. He described his symptoms, which echoed the same difficulties that he had discussed with Dr. Witgert. [DE 14, ML 143].

MetLife's denial of benefits was based on a rejection of the credibility of Keegan's statements during the interview.

Under these circumstances, the lack of a physical exam further supports this Court's finding that the determination was arbitrary and capricious. *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263—64 (6th Cir. 2006) (finding that the decision not to order an examination, where the plan reserved the right to do so, was arbitrary and capricious, particularly where the administrator made credibility determinations concerning subjective complaints); *Pitts v. Prudential Ins. Co. of* Am., 534 F. Supp. 2d 779, 790 (S.D. Ohio 2008) ("[T]his Court finds that [the administrator]'s decision not perform an IME, in light of its citation to a lack of data verifying the severity of any potential disabilities, supports the finding that the termination of benefits was arbitrary and capricious.").

MetLife's determination to discontinue his LTD benefits was arbitrary and capricious because it was not a reasonable conclusion and was unsupported by any evidence in the record indicating that his cognitive deficiencies had improved since Dr. Witgert's testing. Additionally, Metlife's reliance on its consultants' record reviews, where Keegan had recently reported continuation of cognitive impairments and where MetLife reserved the ability to require additional medical exams, is further evidence of MetLife's arbitrary and capricious analysis.

**B. Keegan is entitled to retroactive benefits.**

Having determined that the administrator's decision was arbitrary and capricious, a court "may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (citation omitted). The court "must have considerable discretion to craft a remedy after finding a mistake in the denial of benefits." *Id.* at 622 (quoting *Buffonge*, 426 F.3d at 31–32)). "[W]here the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622. Where a claimant is clearly entitled to disability benefits, "[p]lan administrators should not be given two bites at the proverbial apple . . . except in cases where the adequacy of the claimant's proof is reasonably debatable." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 172 (6th Cir. 2007)(finding that remand was not necessary).

In this case, there was no evidence that Keegan's cognitive issues had resolved to the point that he was no longer disabled at the time MetLife denied his benefits. The evidence in the record supports the conclusion that Keegan was disabled as a

result of his cognitive issues at the time that MetLife denied his benefits. In the absence of evidence of improvement, or of some other basis for MetLife's change in determination, and given that Keegan had previously been declared disabled, Keegan was "clearly entitled" to benefits. *Elliott*, 473 F.3d at 622 (quoting *Buffonge*, 426 F. 3d at 31—32).[3]   Accordingly, Keegan will be awarded retroactive benefits.

### C. The Court will not determine whether MetLife's alleged procedural error would permit outside evidence to be considered.

Having determined that MetLife's denial of benefits was arbitrary and capricious, this Court need not address Keegan's argument that the Court should consider Dr. Witgert's April 4, 2012 neuropsychological testing report, which was completed after MetLife's final denial of Plaintiff's claim and is not part of the administrative record on review.   Generally, the court only considers the evidence available to the plan administrator at the time a final decision was made. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990).   Keegan argues that MetLife failed to comply with the procedural

---

[3] Although not considered in this Court's analysis for the reasons discussed in Section C herein, the results of Keegan's cognitive tests on April 4, 2012, if considered, would further bolster the conclusion that Keegan remained disabled during the time period between his initial denial and at least that date of testing, particularly when considered in light of the lack of evidence of improvement of his symptoms during that time period.

protections of 29 U.S.C. § 1133 because its denial letter did not adequately describe the additional information that MetLife was looking for in review of his claim, specifically, updated cognitive testing. *See Vanderklok v. Provident Life and Acc. Ins. Co.,* 956 F.2d 610, 616 (6th Cir. 1992) ("The letter is defective because it fails to provide the specific reason or reasons for denial . . . . nor is there any indication of what additional proof may be required."). However, having found that MetLife's decision was arbitrary and capricious on the basis of the record before it, the Court need not address whether the additional evidence should be considered in this instance.

**D. MetLife is entitled to recover the overpayments made to Keegan and Keegan is entitled to recover the amount of the underpayments by MetLife.**

Having determined that MetLife's determination to deny LTD benefits in June 2011 was arbitrary and capricious, the Court must turn to the parties' remaining claims. Both parties claim that they are owed additional money as a result of errors made in the calculation of benefits between August 4, 2009 and June 3, 2011, the 22 month period in which Keegan was originally entitled to benefits. MetLife filed a Counterclaim [DE 7] arguing that Keegan was overpaid LTD benefits because he received social security disability insurance benefits from himself and his dependents. Although some reduction was made to

Keegan's benefits on this basis during the initial period, the net overpayment owed to Metlife, it argues, is currently $16,536.11. [DE 7]. Keegan argues that he was underpaid benefits through the relevant period because Metlife did not include his bonus as part of his predisability earnings, as allowed by the Plan. [DE 22; DE 14, ML 1403 ("Predisability Earnings . . . includes . . . awards and bonuses, except for one time pay-out.")]. Consequently, Keegan argues he was underpaid by a total of $12,858.78. [DE 22, Page ID 22].

### i.  MetLife's claim of overpayment.

Keegan does not dispute that he owes the overpayment or the amount of overpayment. Keegan concedes that "MetLife would have a clear right under the policy's language to recover the overpayment from 'any future Disability benefits.'" [DE 33, Page ID 302]. Instead, Keegan argues that MetLife cannot recover the overpayment from him directly. Keegan argues that MetLife has not stated a claim for equitable relief, as required under 29 U.S.C. § 502(a)(3), because the Plan did not adequately identify a particular fund[4] from which recovery may be had or whether the

_____

[4] ERISA provides that a fiduciary may bring a civil action to enforce the terms of a plan to obtain equitable relief, but not an award of compensatory damages. *See* 19 U.S.C. § 502(a); 29 U.S.C. § 1132(a)(3); *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 255—60 (1993). "For restitution of insurer overpayments to be of an equitable nature, the restitution must involve the

funds are still in Keegan's possession. Furthermore, Keegan argues that MetLife may not recover his social security benefits directly due to the Social Security Act's anti-assignment provision. 42 U.S.C. § 407(a).

As this Court has found that Keegan is entitled to disability benefits and it is undisputed that MetLife may recover the overpayment by reducing the LTD benefits paid under the Plan, MetLife has a method of recovery of the overpayments available to it. This Court sees no need to determine whether MetLife could recover from Keegan directly. MetLife's claim to overpayments, to the extent that MetLife seeks to recover from Keegan directly, is denied as moot.

**ii. Keegan's claim of underpayment of LTD benefits.**

MetLife does not dispute the merits of Keegan's claim that he was entitled to additional LTD benefits because his bonus was not included in his predisability earnings calculation. Instead, MetLife argues that Keegan is precluded from raising

---

imposition of a constructive trust or equitable lien on 'particular funds or property in the [insured's] possession.'" *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 274–75 (6th Cir. 2010) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)). "The plan must identify a particular fund, distinct from an insured's general assets, and the portion of that fund to which the plan is entitled." *Hall*, 595 F.3d at 275 (citing *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363 (2006)).

this issue because he neglected to raise it earlier in the administrative proceedings. Keegan asserts, and MetLife conceded in its Answer [DE 7], that he exhausted his administrative remedies under the plan. MetLife argues, however, that Keegan has not exhausted this issue at the administrative level because it was first raised during briefing of this matter. Keegan argues that claim exhaustion, rather than issue exhaustion, controls the matter and that issue exhaustion is not required.

ERISA has been read to require claim exhaustion. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). However, the Sixth Circuit, in an unpublished decision, has "decline[d] to impose such [an issue exhaustion] requirement because of the non-adversarial nature of ERISA proceedings." *Liss v. Fidelity Emp'r Servs. Co.*, 516 F. App'x 468, 474 (6th Cir. 2013) (citing *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 632 (9th Cir. 2008) ("The non-adversarial nature of the ERISA proceeding weighs against imposing an issue-exhaustion requirement.")); *see also Sims v. Apfel*, 530 U.S. 103, 110 (2000) ("Where . . . an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker."). This Court will, likewise, decline to require issue exhaustion in this matter.

MetLife does not contest Keegan's assertion that he was underpaid by $584.49 per month, or by a total of $12,858.78 due to the exclusion of his bonus from the calculation of his predisability earning. Accordingly, MetLife shall tender the appropriate amount to Keegan for the 22 month time period in which he was entitled to benefits, and include the bonus amount in the calculation of Keegan's benefits going forward.

**IV. Conclusion.**

For the reasons stated herein, Keegan's Motion for Judgment [DE 22] is hereby **GRANTED** and MetLife's Motion for Judgment [DE 32] is **DENIED**. MetLife may recover the amount of overpayments to Keegan from the LTD benefits owed to him.

This the 31st day of March, 2014.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge